## John Patten v. The People.

*Homicide: Riotous Assembly: Duty of prosecution in offering proof: Declarations: Right of defence: Cross-examination.* On a trial for a homicide where it appeared that the riotous assembly, (of which the deceased was one) gathered at the time, grew out of and was connected with one which had assembled there the night before, and with the same object—it was held that all the proceedings and objects of both gatherings, together with the provocation to the defendant and his acts, constituted together one entire transaction.

*Held, further,* that as the homicide resulted directly from said assemblages, and their riotous conduct, it was the right and duty of the prosecution to show the transaction as a whole, its nature, and its objects, whether tending to show the guilt or innocence of the defendant.—*Maher v. People, 10 Mich. 212; Brown v. People, 17 Mich. 429.*

*Held, further,* that whether the prosecution failed to do so or not, it was the right of the defendant, either by cross-examination or by his own witnesses, to go fully into all matters thus constituting the *res gestæ,* and to show any act or declaration of any one of either assemblage, in furtherance of the common object, or in reference to it, from its inception to its close—the combination once being shown.

*Cross-examination: Res Gestæ.* A witness for the prosecution (one of the rioters,) having testified fully in reference to the proceedings of the first night, and that defendant had confessed to having struck deceased on the second night, denied on cross-examination, that he had stated to different persons soon after, that he was present as a horner, but was only a mere looker on, and took no part in the matter whatever.

The court refused to permit the defendant to contradict said testimony.

*Held,* that said statements related to the *res gestæ,* and their contradiction was competent.

PATTEN *v.* THE PEOPLE.

*Justifiable Homicide.* There is no positive rule for the definition of justifiable homicide. It must depend upon the circumstances and surroundings of each case.—*Pond v. People,* 8 *Mich.* 150.

*Justifiable Homicide: Defense of one's family.* If from the defendant's knowledge of his mother's peculiar physical con dition, he had reason to believe that her life was endangered by the riotous proceedings, and if the rioters were informed of her condition, or if all reasonable or practicable efforts had been made to notify them of the fact, it was sufficient to excuse his conduct toward them to the same extent as though the danger to her life had resulted from an actual attack upon her person, or as though in the like danger from an attack upon himself; and he was justifiable in using the same means of protection in the one case as the other.

*Held, further,* that if the noise and tumult of the rioters prevented defendant giving them notice of the danger to his mother, he was excused from doing so.

*Homicide. Rights of defendant.* The defendant was justifiable in acting for his defense according to the circumstances as they appeared to him; and if from those circumstances, he believed there was imminent danger of death, or great bodily harm to himself, or any member of his family, and he had tried all reasonable means which would, under the circumstances, naturally occur to a humane man to repel the attack, he might resort to such forcible means, even with a dangerous weapon, as he believed to be necessary for protection, and if such means resulted in the death of any of the supposed assailants, the homicide would be excusable.

*Criminal Cases: Mode of review: Writ of Error.* In criminal cases where the proceedings before judgment are sought to be reviewed by the Supreme Court, they are to be certified to this Court by the clerk without the agency of a writ of error, and no assignment of errors is necessary.

*Heard 7th and 8th. Decided April 27th.*

Error to Oakland Circuit.

The defendant was tried and convicted for the homicide of one Elias Cowles.

Upon the trial the people offered proof, tending to show that a few days prior to the 17th day of December, 1867, the defendant, John Patten, who was then residing in Highland, in said county, got married to a Miss Sarah Grow; that on the night of the 17th, Luther Mills, George Mills, James Lockwood and others, to the number of from eight to fifteen, got together and went to said respondent's to "horn" him. That they went there in the night time, between nine and ten o'clock; that one of the party had a gun; others tin horns, cow-bells, &c.; that they went in upon the premises of said Patten, who was then living upon a farm with his father and mother; and commenced their "horning" by shooting the guns, blowing the horns, ringing bells and yelling, and soon after defend-

ant came out and ordered them off, and they all ran off. It further appeared that defendant heard that the horners purposed to visit his house the next night.

The people further offered proof tending to show that Elias Cowles, the deceased, on the following day, made preparations to go the next night to "horn" the prisoner; that he met with some fifteen or twenty others, and on the night of the 18th, was elected captain; that they had guns, tin pans, horns, a horse-fiddle and other instruments to make noises with; that they had seven or eight guns, army muskets, so-called, and shot guns; that one of the party had a shot gun loaded with powder and shot, which had been loaded a few days before to shoot rabbits with and that the boy who had this gun fired it off in the air after they got to Patten's; that they went into the yard of the premises of the defendant, and there fired their guns into the air, and blew their horns, rang their bells, and made as much noise as they could upon these instruments; that they passed from the road into the yard through a large gate; that they walked along still, without making any noise, until the word was given, and then all the guns were to be fired at once, and then the other noises to commence; that Elias Cowles requested William Lee, one of the party, and a witness, to give the word as they, the Pattens, would not be so likely to know his voice; that he, William Lee, did give the word, and all the guns were fired; that the said Cowles had a gun; that he (Lee,) had a joint of a flute, and blowed on it; that there was considerable yelling; that after the noise had been going on a few minutes, John Patten came to the door, near where they were, but said nothing; he went back into the house, and soon came out and went towards Elias Cowles, who was standing facing him, with the butt of his gun on the ground; that John Patten ran up to him; that said Lee heard a blow; that he looked and

saw Elias Cowles partly down on his hands and knees; that Patten struck a second blow; that he then saw he had an axe, and this blow struck Cowles on the head and knocked him clear down; that the witness hallooed "for God's sake don't let him kill this man,'" and stepped towards the prisoner, and he ran back into the house; that Cowles got up, picked up his hat and his gun—some one asked him if he was hurt, and he said he guessed not much, but he must go and get a drink of water; that he died next day from wounds received that night.

The prosecution asked Lee under objection:

"Did you go to Patten's for any other purpose than to 'horn' Patten?"

The Court overruled the objection and admitted the evidence, and defendant excepted.

The counsel for the defendant asked the peoples' witness, on his cross-examination, if Cowles did not tell him, that the boys running away the night before was a cowardly act, and that night they were going to get a company together and go there and stand their ground.

The prosecution objected, and the Court sustained the objection.

On the part of the defendant, it appeared that he resided with his father and mother who were aged and infirm people; that the old lady was quite feeble, and had for many years suffered from palpitation of the heart, and also from spells of dizziness; that any unusual excitement brought on the palpitation of the heart, and any over doing or prostration was likely to be followed by attacks of dizziness.

That defendant on being aroused by the noise out of doors, went down stairs; that his mother was in great terror, lest violence should be done.

That she begged him to drive them off; that he then stepped to the door and ordered them off; they paid no

attention to it; the noise kept on; he stepped to the door again, and took the axe and stepped out, and several voices cried, " shoot him; damn him, shoot him;" that, as he stepped out owards them, the crowd sallied on to him, and he was struck with a gun or other weapon; that he struck deceased, and then went into the house, and that several gun wads were fired through the open door.

The counsel for the prisoner submitted several requests in writing, and asked the said Court to charge thereon, among which were the following:

*First*—" That private persons may forcibly interfere to suppress a riot or resist rioters; and although a riotous attack be not a felonious one, yet if the riot be directed against the property or the house of the person who resists it, in making such resistance, he has a right to the use of such means as will make the resistance effectual; and if in making such resistance effectual, one of the rioters be necessarily killed, the killing will be excusable homicide."

The Court refused, but did instruct the jury, " that if the rioters were there upon the premises of the prisoner, and did no injury to the property, and did nothing but make their noises, it would be but a mere trespass, and the owner could not eject them or expel them by force, to the extent of taking life, unless to prevent some felony about to be committed or attempted, by the rioters, or to save life or limb."

The following requests to charge were all refused and excepted to.

*Second*—" That persons have a right to the peaceable possession of their premises and property, and if, while in the peaceable possession of such property, a riotous assemblage takes possession of such property in the night time, and undertake to maintain such possession by force, the owner may repel such riotous assemblage by force, and if in mak-

ing such resistance effectual, one of the rioters be necessarily killed, the killing will be excusable homicide."

*Third*—" That the law of self-defence is a law of nature. It extends not only to the person himself, but to those who bear the relation to him of parent and wife, and it also extends to his house, called in the law his " castle," and a person may make effectual this defence from all attack; and if in making this defence, it becomes necessary to take the life of the aggressor, it will not be felonious, but will be excusable homicide."

*Fourth*—" That, if from all the evidence and circumstances proved, the jury find that the prisoner had reasonable grounds to believe that there was, before he struck the blow, a design to commit any felony upon his house or upon any members of his family, and that the deceased was either principal in such design or present as accessory, the killing of the deceased will be excusable homicide, although it afterwards appear that no felony was intended."

The Court refused, except with the following qualification and amendment, to wit: after the words " members of his family" insert these words, " and the danger imminent," and at the end of said request, add the words " provided he first used all other means in his power to prevent the accomplishment of the supposed intended felony."

*Fifth*—" That the prisoner had a right to judge, and upon the facts and circumstances which surrounded him, as they appeared to him at the time of the homicide; and, if from all the evidence the jury find, that the homicide was committed in repelling an unlawful and malicious assault upon his dwelling house, and he used only reasonable and necessary means to prevent it, the act of the killing will be excusable homicide."

The court refused, except with the following qualification and amendment, to-wit: after the words, " appeared to him at the time of the homicide," insert the following

words: "but at his own peril—and it is the province of the jury to determine, from all the facts and circumstances, whether the accused had reasonable cause to apprehend imminent danger to life or limb, or that a felony was about to be committed."

*Sixth*—"That if the jury shall find that the prisoner was laboring under a reasonable apprehension that his mother was so affected, by the riotous assemblage, that she was likely to die, or to receive grievous bodily harm, and he could not remove the rioters from his premises without force, and by resort to force, the deceased was killed, the killing will be excusable homicide, provided no more force was used than was necessary, under the circumstances, as they appeared to the prisoner at the time, in repelling the riotous assemblage."

After the judge had concluded his general charge to the jury, he further charged that a riot was not a felony, but only a misdemeanor.

The defendant was convicted of manslaughter.

*M. E. Crofoot,* for plaintiff in error.

1. Only the acts of the rioters, could be given in evidence on behalf of the people. Their undisclosed intents and purposes were immaterial.

2. Affirmative evidence having been offered by the people, and admitted by the court, to show the purposes and the intent with, which the rioters went to Patten's, viz: for no other purpose than to horn him, it was certainly competent for the respondent to meet that evidence by showing that they went for other and different purposes, namely: that they went there with an intent to remain, and conduct their riot with force and violence, and to engage in actual conflict, if need be, in order to remain.

Under the same point we claim that the court erred, in not permitting the counsel for the respondent to show, on the cross-examination of Delos Alger, a witness called

by the people, all of the conversation that was had between the witness and Cowles, at the time Cowles spoke to him about going; the witness, on his direct examination, having been examined on that point.

3. The defendant was justifiable in defending himself from the attack of the rioters even to the taking of life.

While it is not denied but that the instructions prayed for, should have been given in case of committing or attempting *felonies* with force, yet as it was claimed as applicable to all misdemeanors, or attempted misdemeanors, it would be improper; it is important to consider:

*a*. What crimes were denominated felonies at the common law?

*b*. Why, in felonies, a different rule should be adopted from that of misdemeanors attempted or committed with violence and force, creating a breach of the peace, and therefore tending to the most serious consequences.

The general term *felony*, "comprises every species of crime, which occasioned at common law forfeiture of lands and goods;" but so general had become the impression that the life of the *felon* became forfeit, that all *capital offenses* obtained the general signification of felonies.—*1 Bl. Com. 94 to 98; 1 Russ. on Crimes, 5th Am. Ed. 14, 15; 1 Bish. Cr. Law, §§ 448, 449.*

Crimes and misdemeanors, are "synonymous terms — though in common usage the word 'crimes' is made to denote such offenses as are of a deeper and more atrocious dye." —*4 Bl. Com. 5.*

"A misdemeanor is any crime less than a felony."—*1 Bish. Cr. Law, 453; 1 Russ. on Cr. 45.*

If one sees a felony being committed, and he does nothing to prevent it, he is himself guilty of crime— *misprision of felony;* that, therefore, in discharging this duty, if he necessarily kill, he is within the principle of *perfect defense.—2 Bish. Cr. L. § 551.*

Mr. Bishop even refers the law of *self-defense* in justifying homicide from a murderous attack, to this principle, rather than the preservation of the life of the assailed party.—*Id.* § *549,* last paragraph.

When there is *a duty to resist the aggressor*, then this right of perfect defense exists.

And although this author seeks to make this duty the controlling point in the right of perfect defense, yet he recognizes the correctness of the authorities which put this right upon the ground of resisting crimes committed with *force;* which *force* creates the necessity; from which it follows that the duty alone does not create the right, but rather the *necessity.*

And this question has been directly adjudicated.— *Gray v. Combs, 7 J. J. Marshall, 478;* Cited *in* § *555, 2d Bish. Cr. L.*

And Blackstone refers this right of defense rather to the prevention of forcible crimes, and also by night, than to the extent of the punishment.—*4 Bl. Com. 180.*

And he also refers the law of self-defense to the right to defend from *forcible attack.—3 Bl. Com. 3 and 4.*

Riots, by the authorities, are classed among the most *dangerous* of crimes; and for their prevention and suppression, the most powerful and urgent means are demanded; and the right of private persons to resist and suppress them by means not allowed as to other misdemeanors, we find stated in the oldest common law authorities.—*1 Hawk. P. C. Ch. 28,* § *14; Id. Ch. 65,* § *21; Text in 1 Arch. Cr. Pr. and Pl. p. 789* [*223*]; *1 Hale P. C. 53, 494, 495; Fost. 272; Poph. 121, cited Id. p. 788, note; 1 Russ. Cr. 285; Mead's Case, 1 Lew. c. c. 184; Id. 1 Russ. 663.*

And it is as well the *duty*, as the right of all per sons—officers and private persons—to suppress riots and prevent affrays. The preservation of the peace is *a duty*

charged upon all who see it broken.—*1 Bish. Crim. Proceed. § 623, 626, 628; 2 Bish. Cr. Law, § 573.*

And so important has it ever been considered to prevent and suppress these crimes, that statutes highly penal, and containing especially efficient provisions, have at most all times been enacted.—*4 Bl. Com. 142 to 147.*

This court in the case of *The People v. Pond,* established the rule that a homicide may be justifiable in repelling a riotous attack, although the riot itself be not *necessarily felonious.—8 Mich. 150–1, 173, 178.*

Under the law, then, as laid down by these authorities, we claim that the respondent had the right to the instructions prayed.

*First.* "Private persons may forcibly interfere to suppress a riot or resist rioters; and although a riotous attack be not a felonious one, yet if the riot be directed against the property or the house of the person who resists it, in making such resistance he has a right to the use of such means as will make the resistance effectual; and if, in making such resistance effectual, one of the rioters be necessarily killed, the killing will be excusable homicide."

*Second.* "That persons have a right to the peaceable possession of their premises and property, and if, while in the peaceable possession of such property, a riotous assemblage takes possession of such property in the night time, and undertakes to maintain such possession by force, the owner may repel such riotous assemblage by force, and if, in making such resistance effectual, one of the rioters be necessarily killed, the killing will be excusable homicide."

*Third.* "The law of self-defense is a law of nature. It extends not only to the person himself, but to those who bear the relation to him of parent and wife, and it also extends to his house, called in the law his "castle," and a person may make effectual this defense from all attacks,

[*of a felonious nature;*] and if in making this defense it becomes necessary to take the life of the aggressor, it will not be felonious, but will be excusable homicide."— *2 Bish. Cr. L. § 569.*

*Fourth.* "That if, from all the evidence and circumstances proved, the jury find that the prisoner had reasonable grounds to believe that there was, before he struck the blow, a design to commit any felony upon his house or upon any members of his family, and that the deceased was either principal in such design or present as accessory, the killing of the deceased will be excusable homicide, although it afterward appear that no felony was intended.

*Fifth.* "That the prisoner had a right to judge, and act upon the facts and circumstances which surrounded him, as they appeared to him at the time of the homicide; and if, from all the evidence, the jury find that the homicide was committed in repelling an unlawful and malicious assault upon his dwelling house, and he used only reasonable and necessary means to prevent it, the act of the killing will be excusable homicide."

*Sixth.* "That if the jury shall find that the prisoner was laboring under a reasonable apprehension that his mother was so affected by the riotous assemblage, that she was likely to die, or to receive grievous bodily harm, and he could not remove the rioters from his premises without force, and by resort to force, the deceased was killed, the killing will be excusable homicide, provided no more force was used than was necessary, under the circumstances, as they appeared to the prisoner at the time, in repelling the riotous assemblage."

The apprehended danger to life, spoken of in the books need, and does, not necessarily contemplate immediate death;

but an injury that would shorten life is within the rule.—
2 *Bish. Cr. L.* § *562.*

And the bodily harm apprehended is not necessarily
such as endangers life.—*Young v. State, 11 Hump. 200 ; 2
Bish. Cr. Law,* § *561.*

The charge then, taken together, and the requests asked
by the prosecutor and singly given, and the requests re-
fused, had an evident tendency to mislead the jury as to
the law of the case : and if the respondent, under all the
circumstances of the case, had a right to use force to sup-
press the riot—to repel the assault—to resist the appre-
hended attack—to protect his household and defend his
dwelling—whether the degree of force used was either
excusable or justifiable—was a question for the jury to pass
upon, under proper instructions from the court as to the law
of the case.—*State* v. *Clement, 32 Me. 279 ; Sefridge's trial,
cited in Wharton on Homicide, 456, 457 ; Maher v. Peo-
ple, 10 Mich. 212, 221 to 224.*

*Dwight May,* Attorney General, for the People.

1. The court below erred in permitting the witness,
William Lee, to answer the question as to whether they
(the horners) went to Patten's for any other purpose than
to horn Patten.

*a.* Lee being of the party who went to Patten's, it was
competent to show by him with what intent he was there,
and if he knew, with what intent the others were there.

Where a person does an act, he may, being a witness,
testify to the motive or intent with which it is done—
*Wheeldon v. Wilson, 44 Maine, 1 ; Seymour v. Wilson, 14
N. Y. 567 ; Foster v. Walker, 25 Id. 430, 9 ; McKoon v.
Hunter 30 Id. 625 ; Bedell v. Chase, 34 Id. 388.*

*b.* If the defendant could show the intent with which
the " horners" went to Patten's, why may not the people ?

*c.* The testimony being admissible, its weight or effect was a question for the jury.—*Hilliard on New Trials, 247, and cases cited.*

What occurred the night before the homicide was a distinct transaction, and not necessarily connected with it. If the "horners" were guilty of a crime the second night, the fact that some or all of them had been to Patten's before, and on a similar mission, would not add to or diminish the offense. It was not a continuous offense.—*Whart. Crim. Law, 446; Whart. on Hom. 182; State v. McCants, 1 Spear, (S. C.) 384; Com. v. Green, 1 Ashmead, 289.*

Nor would this proof show a felonious intent on the part of Cowles, and those with him. It would show the reverse, for it is quite clear from the whole record that they went to Patten's to "horn" him, and for no other purpose.

2. The court refused to charge that private persons may forcibly interfere to suppress a riot or resist rioters, &c.

*a.* Chapter 184, *Comp. Laws* does not authorize private persons to suppress a riot.

*b.* A riot is only a misdemeanor.—*Chap. 184, Comp. Laws.*

*c.* And it is not a felony at Common Law.—*2 Bish. Crim. Law, 963.*

*d.* A private person may act only to prevent the commission of treason or of a felony.—*1 Bishop Crim. Pro. 622, 623.*

The charge on this point as given, was correct.—*Wharton on Homicide, 212, 213; People v. Doe, 1 Mich. 456; People v. Horton, 4 Id. 67; Pond v. The People, 8 Id. 150.*

3. It is not excusable homicide, when life is taken in defending one's premises against an attack, not of a felonious nature.

4. A person is not permitted to measure his own wrongs, and to judge of the necessity of taking life. It would

permit killing for the slightest trespass.—*Pond v. The People, 8 Mich. 164, 175, 177; Shorter v. The People, 2 Comst. 193; U. S. v. Wiltburger, 3 Wash. 515; People v. Lamb, 2 Keyes, 360.*

5. Before the taking of life will be excusable or justifiable, the accused must use all other means in his power to prevent the accomplishment of the supposed intended felony.—*Pond v. The People, 8 Mich. 150; Shorter v. The People, 2 Comst. 193; Stewart v. State, 1 Ohio, St. 66; 11 Allen, 205, 206.*

CHRISTIANCY J.

The evidence on the part of the prosecution, as well as that on the defense, showed very clearly that the riotous assembly, which gathered about the house of the defendant, on the night of the homicide, grew out of, and was directly connected with, that which had assembled there the night before, and had the same object in view; that Cowles, the deceased, on the day intervening, went around to several boys and young men, to induce them to go the next (second) night; that he was active in getting up this second riotous assemblage, and was elected their captain. All the proceedings and objects therefore of both assemblages, the provocation thereby to the defendant, and his action in opposition to them, constituted together one entire transaction, or the *res gestæ.* And as it was also clear that the homicide, whatever its legal character, resulted from these assemblages, and their riotous conduct, and would not otherwise have occurred, it was not only the right, but the duty of the prosecution to show generally the transaction as a whole, its nature and its objects, whether its tendency should be to show the guilt or innocence of the defendant.—*Maher v. The People, 10 Mich. 429, and Brown v. The People, 17 Mich. 212.* This was not only necessary in fairness to the prisoner, but to enable the jury, from a view of the whole,

to estimate and apply each particular item of evidence which might be adduced in any stage of the case.

But whether the prosecution did this or not, it was the clear right of the defendant, either by cross-examination, or by witnesses introduced in his defense, to go fully into all matters thus constituting the *res gestæ*. He could not be bound by the showing on the part of the prosecution, but was at liberty to show that the transaction as a whole, or in any .of its parts or purposes, was different from that shown by the prosecution. And for this purpose it was competent for him to show any act or declaration` of any individual of either assemblage in furtherance of· the common object, or in reference to it, from the inception to the close of the transaction; their combination or concert having already sufficiently been shown.

The defendant undertook to do this by the cross-examination of the prosecutor's witnesses, and the proposed cross-examination was strictly legitimate under any rule ever applied to cross-examination, as it related directly to matters called out on the direct examination. The prosecutor's witnesses, some of the rioters themselves, had already given evidence, tending to show that the only object of the rioters was to go upon the defendant's premises for the purpose, as they expressed it, of "horning the defendant," who had lately been married, and that they contemplated no violence or injury to person or property. The defendant offered to show, on cross-examination, that at the time the rioters made the arrangement to assemble the second night on the defendant's premises, their running away the night before was talked of by them, and was called a cowardly act; that they were going to get a company together that (second) night, who were not afraid; and would stand fire, and stay on the premises, and horn the defendant, whether he liked it or not; and that they would not go off the premises or be driven off.

This cross-examination the court erroneously refused to

permit; and the error would not have been less, had the defendant offered to show the same facts by witnesses of his own.

The court equally erred in refusing the defendant the right to show that Cowles, the deceased, had said substantially the same thing to one of the witnesses on the part of the prosecution.

Henry Butler, who was one of the rioters on the first night (though not upon the second), and who had testified fully on the part of the people in reference to the proceedings of that night, and had also testified that defendant had confessed having struck the deceased three times on the last night, was asked on cross-examination whether he did not, at the house of Mrs. Barret, a few nights after, state to her, that he was not there the first night as one of the company of the horners, but that he happened there as a mere looker on, and took no part or lot in it whatever; to which he answered in the negative. Similar questions were asked him as to similar statements to other persons—all which he denied. These questions were avowedly asked for the purpose of laying a foundation for impeaching him by showing that he had made statements out of court in reference to the matter, different from those now made under oath.

The court holding that such statements if made, related to matters wholly collateral, and not to the *res gestæ*, refused to allow the defendant to contradict him, by showing that he had made the statements which he denied having made. This also was erroneous. The statements related to the *res gestæ*, and the proposed contradiction, if shown, would have tended seriously to weaken his credibility.

Various questions were raised upon the charge to the jury, and several special requests were made by defendant to charge upon specific points, some of which were refused

18 Mich.— w

or charged in a modified form; and some were based upon hypotheses not warranted by any evidence in the cause.

We think it better to indicate what should have been the principles of the charge as a whole upon the points in dispute, than to consider the detached parts presented by the several requests to charge, which would tend rather to confuse, than elucidate the real questions involved.

No fault seems to have been found with the charge as it related to the distinction between murder in the first and second degree, or between murder and manslaughter.

The object of all the defendant's special requests was to obtain from the court a charge which should authorize or require the jury, upon certain supposed states of facts, to and the killing excusable homicide.

A correct idea of excusable homicide is not perhaps easily expressed by a brief abstract definition, without special reference to the facts of particular cases. We accordingly find the latter mode adopted in all the books. It has been thought safer to illustrate by particular instances, than to undertake to define, in advance, all the particular elements or combinations of facts which may render homicide excusable.

Of course, the enumeration of particular cases, does not exclude any others falling within the like principles.

But the principles which underlie and result from all the cases in which the homicide has been held excusable in self-defense, or in defense of one's family or persons standing in particular relation to him or of his property, are so fully and accurately stated in the opinion of my brother *Campbell* in *Pond v. The People, 8 Mich. 150,* that an attempt to enumerate them here, would be a mere repetition. The principles there laid down, apply equally to the present case upon certain states of fact which it was competent for the jury to find from the evidence.

That case, however, differed from the present in certain

important particulars. There an actual attack upon the defendant's dwelling was going on, and the rioters were in the act of demolishing it, and a servant of the defendant, then in the house, was being violently and, to all appearances, dangerously assailed when the fatal shot was fired.

In the present case, no actual attack had been made upon the defendant's house, no forcible attempt to enter; and unless the defendant, when he stepped out of the house with the axe, was, as in his statement he claimed to be, actually struck by some one or more of the rioters, there was no actual attack made upon the defendant, or any one of his family. There was, however, evidence tending to show that, when the door was standing open, and the defendant and his father and mother were ordering the rioters off, the wads from some of the guns were fired into the house. The evidence also tended to show that the defendant knew or understood that the general and original object of the rioters in assembling there, was to annoy him and his family by the blowing of horns, ringing of bells, firing of guns loaded only with powder and wads, and by other noises, rather than personal injury to himself or any of his family. But there was also evidence that before the defendant stepped out, there were threatening cries among the rioters to "bring him (or fetch him) out" or "to bring or fetch them out" which must have referred to the defendant, and perhaps to his wife, and possibly to his father and mother.

Considering the case first, with reference only to the facts existing prior to the time when the defendant went out with the axe, and without reference to the peculiar effects produced by the conduct of the rioters upon his mother, there was nothing, I think, in the evidence fairly tending to show a state of facts which would justify or excuse the defendant in rushing out and attacking any of the rioters with an axe, or other dangerous weapon, for the purpose of compelling them to desist or leave,

though he might have been excused for attempting to drive them off by force, and even by blows with any instrument not calculated to endanger life or limb. But though, from the sudden, violent and capricious impulses to which an excited mob is always subject, danger may always be naturally apprehended, especially about a man's dwelling at night, whatever the original object of the assemblage may have been — and no one can estimate the nature or extent of the danger — yet, until some actual violence had been done or attempted in this case against either the house, or its inmates, the necessity which alone could excuse taking the life of any of the assailants, had not yet occurred, and might never occur. And though the defendant had the right to act under the circumstances as they appeared to him; yet up to this point (without reference to the defendant's mother,) there was nothing in the circumstances which fairly tended to show that he could have believed the dire necessity to have arisen.

2d. We will next inquire how far the case may be affected by the peculiar effects, produced upon the defendant's mother by the conduct of the rioters.

There was evidence from which the jury might have found that, owing to the feeble health of the mother and her peculiar infirmities, the fear and excitement caused by the conduct and threats of the rioters produced upon her alarming effects, from which the defendant might well have apprehended her speedy death if such conduct were allowed to continue. But to render this available to the defendant as an excuse for the homicide, the jury should also find that the rioters were informed of this condition of the mother, and the effects produced by their conduct; or that every reasonable and practicable effort had been made to notify them of the facts — as such are not the ordinary effects of such causes upon people generally, and therefore, would not naturally be anticipated by the rioters. But if

they had such notice, or the defendant was prevented from giving it, by the noise and tumult of the rioters; then I can see no sound reason why the danger to the mother from their conduct, should not have excused the conduct of the defendant towards them, to the same extent as if the danger to her life had resulted from an actual attack upon her person, or the like danger to the defendant from an attack upon him. And the defendant would, I think, have the right to resort to the same means of protection in the one case as in the other. What these means are, in what contingency they may be used, and how they are to be judged of by the defendant, will be considered under the next head.

3d. There was evidence — and the statement of the prisoner made on the trial must for this purpose be treated as such — from which the jury might have found (as supposed in part of the charge given by the court below) that the defendant took the axe from the house for the purpose of self-defense, and stepped out of the door for the purpose of inducing the rioters to leave, or of dispersing them; and that, as he stepped out, the crowd cried out "kill him, damn him, kill him," and that rushing towards him, some one or more of them hit him with a gun or club or other weapon. If this hypothesis should be found to be true, instead of the charge given by the court, the jury should I think, have been told substantially that the defendant was excusable for acting according to the surrounding circumstances *as they appeared to him:* and if, from those circumstances, he believed there was imminent danger of death or great bodily harm to himself or any member of his family, then, if he had already tried every other reasonable means, which would, under the circumstances, naturally occur to an honest and humane man, to ward off the danger or repel the attack, he might resort to such forcible means, even with a dangerous weapon, as he believed to be necessary for protection; and if such means

resulted in the death of any of the supposed assailants, the homicide would be excusable.

It is not to be forgotten that the rioters assembled there for an illegal object; for the purpose, by their own confession, of a wanton and unprovoked insult and defiance to the defendant and his family; that the unpleasant, and as it turned out, the terrible crisis, was forced upon the defendant against his will, by their criminal conduct. And while provocation, as such, cannot render the homicide excusable; yet in estimating the nature and imminence of the danger, in the choice of means to avoid it, or the amount of force, or kind of weapon to be used in repelling it, the excitement and confusion which would naturally result from the surrounding circumstances, for which the rioters alone were responsible, should not be overlooked. To require of the defendant, while under a high degree of mental excitement, induced by their wrongful and criminal conduct, and without his fault, the same circumspection and cool, deliberate judgment, in estimating the danger or the choice of means for repelling it, as we, who are unaffected by the excitement or the danger, may now exercise in contemplating it, would be to ignore the laws of our being, and to require a degree of perfection to which human nature has not yet attained. Of the weight a jury should give to these considerations no safer standard can be found than their own individual consciousness, and the consideration of what they, with the honest purpose of avoiding the danger, without unnecessarily taking life, might, under the circumstances in which the defendant was placed, be likely to do.

As no fault was found with the charge in reference to the distinction between murder in the first and second degree, or between murder and manslaughter, it is unnecessary to consider the phases of the case which might call for a charge upon those questions.

A new trial must be granted.

It is proper to notice the erroneous practice which has been resorted to in this case of bringing up the case upon a writ of error before judgment. There is in such a case no judgment to reverse, and no appropriate function to be performed by a writ of error. By reference to chapter 197, *Compiled Laws*, it will be seen that the record and proceedings, including the exceptions, should have been certified to this court by the clerk, without a writ of error. But as the certificate of the clerk by way of the return to this writ, substantially complies with this requisition, this court is equally possessed of the case. *See Shannon v. The People, 5 Mich. 36.* No writ of error should have issued in the present case, and no assignment of errors was necessary.

The other Justices concurred.