## Commonwealth v. Collazo, Appellant.

Argued April 17, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

George F. Douglas, Jr., for appellant.

Richard C. Snelbaker, Assistant District Attorney, with him Harold S. Irwin, Jr., District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 21, 1962:

This is one of those homicidal cases where life has been treated as if it were something paltry, instead, as it really is, the all-pervading motif of the universe. As the result of an absurd altercation, which involved no important factual, and certainly no moral issue, between the contestants, life was destroyed and the destroyer has become a criminal. The convicted destroyer now appeals to this Court seeking the freedom which he himself threw away when he plunged his knife into the heart of his adversary. He claims that the judge at his trial improperly instructed the jury which convicted him.

The facts follow. An hour or so after midnight on November 3, 1960, Miguel Ruis, the victim of the mortal attack, and Rafael Collazo, the deadly assailant, staged a short combat in an apple orchard at Pennsylvania Farms, near Mechanicsburg, in the vicinity of a large two-story building used by migrant workers as living quarters. It appears that Ruis and a certain Anibal Matos had arranged for the latter to drive Ruis to Harrisburg. However, before they could embark on their trip, a certain Alphonzo Lopez, another migrant worker, took Matos's car on an errand of his own and damaged it. When Ruis learned of this he seized a wooden stake measuring 28 inches long, ¾ths of an inch thick, 2½ inches wide at one end and taper-

ing, 7 inches from the other end, to a point for driving into the ground. With this stake he set out to chastise Lopez, and, finding him, began to beat him.

Into this cheap, rapidly-moving melodrama now entered a character named Elijah Leary, known also as Big Larry. He pulled Ruis away from Lopez and led him to his own car, promising to make up for the deficiency caused by Matos's misadventure, by driving him himself to Harrisburg. When they arrived at Big Larry's car, Larry opened the door to have Ruis enter. At this time and place the defendant Rafael Collazo entered into the act. For no reason that is apparent in the record he began to argue with Ruis and Ruis argued back. This debate was conducted in Spanish and since Big Larry, who was the only hearing witness present, did not understand Spanish, the details of the wordy wrangle have not been vouchsafed to posterity.

At his own trial Collazo said that Ruis was berating him because he had taken Lopez's side in the argument between Ruis and Lopez. Ruis reinforced his side of the argument with the stick in his hand, applying blows to Collazo's face and shoulders, but Collazo brought the debate quickly to an end with an irrefutable refutation by whipping out a butcher knife from under his shirt, driving it through Ruis's ribs and sheathing it in his heart. As Ruis fell, Collazo leaped astride him apparently to make certain that he had truly ended the argument.

On this showing of facts the district attorney of Cumberland County, where the killing occurred, concluded that he could not hope for a conviction on the charge of murder and he accordingly asked the grand jury of the county to return an indictment of voluntary manslaughter, which it did. The defendant was tried under this indictment and convicted.

In the lower court he filed motions for a new trial and arrest of judgment. Both motions were refused

and the defendant was sentenced to undergo imprisonment for a term of not less than five nor more than ten years. On his appeal to this Court the defendant asks only for a new trial, contending that the trial judge did not properly charge the jury with regard to the right of the defendant to stand his ground when Ruis began to hit with the stick. The judge charged the jury: "It is certainly true that every citizen may rightfully traverse the street or may stand in all proper places and need not flee from everyone who chooses to assail him. Without this freedom our liberties would be worthless but the law does not apply this right to homicide. The question here does not involve the right of mere ordinary defense, or the right to stand wherever you may rightfully be, but it concerns the right of one man to take the life of another. Ordinary defense in the killing of another evidently stands upon a different footing. When it comes to a question whether one man shall flee or another shall live, the law decides that the former shall flee rather than the latter may die."

This is practically a carbon copy of what Justice AGNEW said in his famous charge in the case of *Commonwealth v. Drum*, 58 Pa. 9, which is regarded more or less as a classic in Pennsylvania's law on the subject of homicide. One can doubt, however, without being disrespectful to the memory of the distinguished jurist, whether jurors, unequipped with an extensive vocabulary and unfamiliar with legalistic terms, could readily understand all of the erudite language in which Justice AGNEW's charge was dressed. For instance, one can inquire whether the average man-on-the-street would comprehend what the learned Justice meant when he scholastically said that the act of the slayer "must not be entirely disproportionate to the assault made upon him."

There are other expositions in Justice AGNEW'S charge which are veiled in a phraseology which might or might not be penetrated by a nontechnical mind. For instance: "In such a case it requires a great disparity of size and strength on the part of the slayer, and a very violent assault on the part of his assailant, to excuse it. The disparity on the one hand, and the violence on the other, must be such as to convince the jury that great bodily harm, if not death, might have been suffered, unless the slayer had thus defended himself, or that the slayer had a reasonable ground to think it would be so."

Charges to juries should not be scholarly jurisprudential essays, intended primarily to convince the appellate court that the subject in controversy was appropriately treated. They should be simple directions to guide the jury along the thoroughfare of a correct factual decision. They should instruct with the simplicity of directional markers along the highway. In this respect, it may properly be said that, perplexing as some of Justice AGNEW'S polished diction might be to some jurors, there can be no doubt that he spoke with the clarity of black paint on white signposts when he said: "When it comes to a question whether one man shall flee or another shall live, the law decides that the former shall rather flee than that the latter shall die."

This is language which no juror, no matter how uneducated, could misunderstand. The proposition presented in that instruction is the issue in this case. Should Collazo have fled and allowed Ruis to live, or was Collazo, under the law, entitled to stand his ground and kill Ruis even though his life was not endangered by the swinging of the stick by Ruis?

Defense counsel maintains that Collazo acted in self-defense and that there was no duty on his part to retreat from Ruis's attack. Whether Collazo was

legally justified in stabbing Ruis under all the circumstances was a clear question of fact for the jury, and it was correctly presented by the trial judge. The weapon employed by Collazo in replying to Ruis's wooden assault was a large butcher knife, 12½ inches in overall length with a blade 8 inches long and 1 inch wide. As already stated, he had this knife on his person the night of the homicide.

The knife originally belonged to one Mayfield, a fellow-worker at the orchard. About a week prior to the killing, Collazo, according to his story, took the knife away from Mayfield because Mayfield was drunk and Collazo feared Mayfield might "hurt himself." Pursuing this story, Collazo said he placed the knife under the cushion of a sofa in the migrants' living quarters. On the night of the killing he withdrew the knife with the intention of returning it to Mayfield, but finding Mayfield drunk again, he retained the weapon, sleeping with it in his pocket. Later he went to a dance. The lower court trenchantly observed on this phase of the evidence: "A butcher knife with several inches of its blade extending from the pocket can scarcely be considered as part of the costume or equipment for dancing."

The defendant admitted on cross-examination that he was aware at all times that he had the knife in his pocket but he did not explain why if he had taken it from Mayfield, he waited a full week before making an attempt to return it and why, when he found Mayfield again drunk he did not return the knife to its safe resting place under the cushion of the sofa.

The knife was exhibited in our Court at the time of the argument, and it is easy to understand why the jury would not believe that so heavy and cumbersome a weapon could have been brought into play in the spontaneous, instinct-driven manner described by the defendant. Only a keen and practiced arm directed

by a coolly balanced homicidal purpose could have guided a slaughterer's knife so unerringly to a fatal spot with one thrust.

Defendant's counsel urges upon us that the lower court should have charged the jury that Collazo had no obligation under the law to retreat, since it was Ruis who attacked first. In support of his argument he cites *Commonwealth v. Mitchell*, 181 Pa. Superior Ct. 225, 230 (1956), where the Superior Court said, quoting from 4 Am. Jur., Assault and Battery, §47: "The ancient doctrine which makes it the duty of a person assaulted to 'retreat to the wall' before he is justified in repelling force by force has been generally modified in the United States. The rule now generally accepted is that one who is assailed may meet force with force without retreating, so long as he uses only such force as is necessary, even though he might with absolute safety avoid the threatened injury or bodily harm by retreating."

This is not the law of the Commonwealth of Pennsylvania and the *Mitchell* case may no longer be cited as authority for the proposition that it is legal to kill even though the slayer " 'might with absolute safety avoid the threatened injury or bodily harm by retreating.' "*

The value of a life, despite valuations placed upon it economically, when extinguished, by courts and juries, is incalculable. Before one may be justified in voluntarily ending another person's existence it must be clear to him that he stands in mortal menace or danger of serious bodily harm. The evidence in the case at bar reveals that Collazo stood in no such

---

* The Superior Court properly stated the law in *Commonwealth v Anderson*, 191 Pa. Superior Ct. 213, 217, namely, "In order to justify kiling in self-defense, the defendant must have reasonably believed that he had no other means of escape from death, or great bodily harm."

jeopardy. His assailant was armed with a stick and no matter with what force he might wield it, all that Collazo had to do to avoid injury, to say nothing of death, was to step back from the arc of the brandishing article. Ruis's weapon was not one which could accomplish any danger beyond the length of the arm of the person who held it. Collazo's duty in the circumstances was to remove himself from the periphery of danger, not to advance closer to it. In order to drive his knife home, Collazo actually increased the danger of being hit with the stick because his (Collazo's) weapon was also one which could only operate through the continuing operation of force at close range. If Ruis had been armed with a revolver the legal situation might well have been different because with a weapon capable of projecting the animus of its possessor far beyond his bodily dimensions, the assailed person is justified in neutralizing that weapon by taking the life of the assailant if the assailed actually and honestly believes that the missile to be projected by the assailant can reach him even though fleeing.

The defendant's counsel cites many cases from other jurisdictions where it is said that the rule about the duty to "retreat to the wall" has been relaxed. No matter what other jurisdictions may say on this point, the value of human life in Pennsylvania has not been legally reduced, nor has the sweetness of a continuing existence been dulled or diminished. In *Com. v. Ware,* 137 Pa. 465 (1890), we said: "Human life is too sacred to be taken unnecessarily."

This aphorism has not been, nor can it be, modified in any way. In fact it has been strengthened as time has gone by and the matter re-appraised by this Court. In 1894 we said in the case of *Com. v. Breyessee,* 160 Pa. 451: "Life may be lawfully taken in self-defence; but it must appear that he who takes it was in imminent danger of death or great bodily harm and that

no other way of escape from the danger was open to him. It is the duty of one who is assailed to flee, if flight is possible; and it is only when he is persuaded that he must suffer death or grievous bodily harm at the hands of his assailant, or take the life of his assailant that he may save his own, that he can justify his act as done in self-defence."

In 1904 we pointed out that one essential ingredient in the legal defense of self-defense is that the slayer "had no other means of escape." (*Commonwealth v. Mitchka*, 209 Pa. 274).

In 1906, this Court said in *Commonwealth v. Johnson*, 213 Pa. 432, that it is "an essential ingredient of justifiable killing in self-defense, that the prisoner must have reasonably believed that he had no other means of escape from death or great bodily harm."

Then in 1908, we reasserted that "the right to take life did not arise while there were other means of escape open to the prisoner." (*Commonwealth v. McKwayne*, 221 Pa. 449).

Defendant's counsel has somehow gained the impression, and so argued orally and in writing, that in the case of *Commonwealth v. Vassar*, 370 Pa. 551, the rule here announced underwent relaxation. Nothing could be further from reality. A reading of the record in that case will reveal that we affirmed the trial judge's charging that where it is a question as to "whether one man shall flee or another shall live, the law decides that the former shall rather flee than that the latter shall die."

This is particularly true where the slaying takes place in a place other than one's home where the householder is not required to "retreat to the wall."

Criminal law is built not only on the foundations of moral principles but on the rock bottom of common sense. The rule of withdrawing before stabbing, and

retreating before shooting, is a good rule because it not only saves the life of the original assailant but it may become, in a manner of speaking, a "lifesaver" for the assailed as well. It will save him from the unceasing remorse of having unnecessarily taken human life, and it will save him from a criminal prosecution which could end disastrously, as it did in the case at bar.

An attempt was made to show that Collazo was hemmed in at the point of the automobile door but the jury found, and justifiably so, that this theory did not coincide with the physical facts. Rafael Collazo had a whole orchard in which to escape from the stick-wielding Ruis. He chose, instead, to courter-attack with a butcher knife and, in doing so, must now eat the fruit of his own folly.

Judgment of sentence affirmed.

Mr. Justice COHEN concurs in the result.