**UNITED STATES of America**

v.

**Bennie L. PETERSON, Appellant.**

**No. 24299.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 4, 1971.

Decided June 29, 1973.

Certiorari Denied Nov. 5, 1973.
See 94 S.Ct. 367.

**1224**

Frank P. Flury, Upper Marlboro, Md. (appointed by this court), for appellant.

John S. Ransom, Asst. U.S. Atty., with whom Thomas A. Flannery, U.S. Atty., at the time the brief was filed, and John A. Terry, Asst. U.S. Atty., were on the brief for appellee.

Before LEVENTHAL, ROBINSON and MacKINNON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Indicted for second-degree murder,[1] and convicted by a jury of manslaughter [2] as a lesser included offense,[3] Ben-

1. See D.C.Code § 22–2403 (1967).

2. See D.C.Code § 22–2405 (1967).

3. *E. g.,* Irby v. *United States,* 101 U.S. App.D.C. 19, 20, 246 F.2d 706, 707 (1957), cert denied, 355 U.S. 961, 78 S. Ct. 547, 2 L.Ed.2d 535 (1958).

nie L. Peterson urges three grounds for reversal. He asserts, first that from the voir dire examination of the veniremen from among whom the jury was selected, the trial judge erroneously excluded three questions which he had requested.[4] He contends, next, that the evidence was legally insufficient to establish his guilt of manslaughter, and that in consequence the judge erred in denying his motion for a judgment of acquittal.[5] He complains, lastly, that the judge twice erred in the instructions given the jury in relation to his claim that the homicide was committed in self-defense. One error alleged was an instruction that the jury might consider whether Peterson was the aggressor in the altercation that immediately foreran the homicide.[6] The other was an instruction that a failure by Peterson to retreat, if he could have done so without jeopardizing his safety, might be considered as a circumstance bearing on the question whether he was justified in using the amount of force which he did.[7] After careful study of these arguments in light of the trial record, we affirm Peterson's conviction.

## I

The events immediately preceding the homicide are not seriously in dispute.[8] The version presented by the Government's evidence follows. Charles Keitt, the deceased, and two friends drove in Keitt's car to the alley in the rear of Peterson's house to remove the windshield wipers from the latter's wrecked car.[9] While Keitt was doing so, Peterson came out of the house[10] into the back yard to protest. After a verbal exchange,[11] Peterson went back into the house, obtained a pistol, and returned to the yard.[12] In the meantime, Keitt had reseated himself in his car, and he and his companions were about to leave.[13]

Upon his reappearance in the yard, Peterson paused briefly to load the pistol.[14] "If you move," he shouted to Keitt, "I will shoot." He walked to a point in the yard slightly inside a gate in the rear fence and, pistol in hand, said, "If you come in here I will kill you." Keitt alighted from his car, took a few steps toward Peterson and exclaimed, "What the hell do you think you are going to do with that?"[15] Keitt then made an about-face, walked back to

4. Discussed in Part II, *infra.*

5. Discussed in Part VI, *infra.*

6. Discussed in Part IV, *infra.*

7. Discussed in Part V. *infra.*

8. See, however, text *infra* following note 18.

9. The car was characterized by some witnesses as "wrecked" and by others as "abandoned." The testimony left it clear that its condition was such that it could not be operated. It was parked on one side of the alley about fifteen feet from a gate in the rear fence which opened into Peterson's back yard. Keitt's car was stopped in the alleyway about four feet behind it.

10. Peterson, inside the house, had been told that Keitt was removing something from his car.

11. There were testimonial differences as to the content and intensity of the exchange. Ricky Gray, Peterson's brother, who had followed him into the yard, stated that Peterson "told Charley he oughtn't to take something off his car . . . ."

Donald Dyson, one of Keitt's companions in the car, said "[t]hey were just arguing," Peterson complaining that Keitt "had been taking stuff off his car and hadn't been paying . . . for anything. . . ." Richard Hilliard, Keitt's other companion, characterized the argument as much more vigorous and profane.

12. Although the time lapse between Peterson's reentrance into the house and his subsequent reappearance in the yard is not precisely fixed, the testimony indicates that it was very short.

13. See Part IV, *infra* at note 61.

14. Richard Hilliard testified that Peterson inserted three bullets. Ricky Gray said there was only one. That there was some loading is uncontradicted.

15. There was abundant evidence that Keitt was intoxicated or nearly so. His companions readily admitted to a considerable amount of drinking earlier that day, and an autopsy disclosed that he had a .29% blood-alcohol content.

his car and got a lug wrench. With the wrench in a raised position, Keitt advanced toward Peterson, who stood with the pistol pointed toward him. Peterson warned Keitt not to "take another step" and, when Keitt continued onward shot him in the face from a distance of about ten feet.[16] Death was apparently instantaneous. Shortly thereafter, Peterson left home and was apprehended 20-odd blocks away.

This description of the fatal episode was furnished at Peterson's trial by four witnesses for the Government.[17] Peterson did not testify or offer any evidence, but the Government introduced a statement which he had given the police after his arrest,[18] in which he related a somewhat different version. Keitt had removed objects from his car before, and on the day of the shooting he had told Keitt not to do so. After the initial verbal altercation, Keitt went to his car for the lug wrench, so he, Peterson, went into his house for his pistol. When Keitt was about ten feet away, he pointed the pistol "away of his right shoulder;" adding that Keitt was running toward him, Peterson said he "got scared and fired the gun. He ran right into the bullet." "I did not mean to shoot him," Peterson insisted, "I just wanted to scare him."

At trial, Peterson moved for a judgment of acquittal [19] on the ground that as a matter of law the evidence was insufficient to support a conviction. The

trial judge denied the motion.[20] After receiving instructions which in two respects are challenged here,[21] the jury returned a verdict finding Peterson guilty of manslaughter. Judgment was entered conformably with the verdict, and this appeal followed.

## II

Shortly before the selection of the jury got under way, Peterson's counsel requested the trial judge to address three questions to the prospective jurors on their voir dire examination. Specifically, counsel wanted them queried as to whether any venireman believed that an inference of guilt should be drawn from the fact that Peterson had been indicted; whether any felt that in the instance of a fatality, "someone ha[s] to pay for" the taking of life; and whether any had an innate fear of firearms that might cause him to view with apprehension a person who possessed or used one. The judge denied the request in toto, and the denial is now assigned as error.

 Examination of prospective jurors is a step vital to the fairness of jury trials. The information elicited on voir dire serves the dual purpose of aiding counsel in the exercise of challenges and the court in the determination of competence to serve.[22] Without knowledge bearing on the qualifications of the veniremen, neither function can

---

16. Keitt fell in the alley about seven feet from the gate. No powder burns were discernible.

17. Dyson and Hilliard who were seated in Keitt's car; Gray, who was in Peterson's back yard; and Murray Simon, a neighbor.

18. The statement was given after Peterson was given suitable warnings. See Miranda v. Arizona, 384 U.S. 436, 467, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Peterson's trial counsel, who is also his representative on appeal, informed the trial judge that he had no objection to introduction of the statement.

19. See Fed.R.Crim.P. 29(a).

20. Peterson's sufficiency-of-the-evidence point turns on the legal principles to be discussed in connection with his assertions of error in the charge to the jury. See Parts IV and V, *infra*. We accordingly defer the point to the conclusion of that discussion. See Part VI, *infra*.

21. See Parts IV and V, *infra*.

22. State v. Higgs, 143 Conn. 138, 120 A. 2d 152, 154, 54 A.L.R.2d 1199 (1956); Marvins Credit, Inc. v. Steward, 133 A. 2d 473, 476 (D.C.Mun.App.1957); Searle v. Roman Catholic Bishop, 203 Mass. 493, 89 N.E. 809, 811–812 (1909); State v. Royster, 181 S.C. 269, 186 S.E. 921, 924, 105 A.L.R. 1522 (1936).

**1227**

be performed intelligently.[23] To the extent that the examinatorial process is deficient, the impartiality of the jury could be compromised.[24]

To achieve its wholesome goals, voir dire examination must be given a wise and liberal scope.[25] Reasonable latitude must be indulged to inquiry into attitudes and inclinations in order to assure the objectivity of the jurors ultimately chosen.[26] To be sure, the trial judge retains a broad discretion as to the questions which may be addressed.[27] But, as the Supreme Court has declared, "[t]he exercise of this discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness."[28]

Peterson argues that the refusal of the three questions he submitted constituted reversible error. The judge's ruling was bottomed on the premise that the purposes for which the questions were requested would be accomplished in other ways.[29] The standard for our review of that ruling is whether the judge's action exceeded the bounds of discretion to Peterson's prejudice.[30] We find it unnecessary to consider whether the questions were proper for, in the circumstances presented, we are satisfied that their exclusion could not have operated detrimentally to him.

Near the outset of the voir dire examination, the judge instructed the venire-

23. Marvins Credit, Inc. v. Steward, *supra* note 22, 133 A.2d at 476.

24. See Crawford v. Bounds, 395 F.2d 297, 303–308 (en banc 4th Cir. 1968, cert. denied, 397 U.S. 936, 90 S.Ct. 941, 25 L.Ed.2d 117 (1970); Evans v. Mason, 82 Ariz. 40, 308 P.2d 245, 249, 65 A.L.R.2d 936 (1957).

25. United States v. Napoleone, 349 F.2d 350, 353 (3d Cir. 1965); United States v. Daily, 139 F.2d 7, 9 (7th Cir. 1944.); State v. Jordan, 83 Ariz. 248, 320 P.2d 446, 449, cert. denied, 357 U.S. 922, 78 S.Ct. 1364, 2 L.Ed.2d 1367 (1958); State v. Daily, 139 F.2d 7, 9 (7th Cir. 1944); State v. McKeehan, 91 Idaho 808, 430 P.2d 886, 897 (1967); Commonwealth v. McGrew, 375 Pa. 518, 100 A.2d 467, 470 (1953).

26. Morford v. United States, 339 U.S. 258, 259, 70 S.Ct. 586, 94 L.Ed. 815 (1950); Dennis v. United States, 339 U.S. 162, 171–172, 70 S.Ct. 519, 94 L.Ed. 734 (1950); People v. Osslo, 50 Cal.2d 75, 323 P.2d 397, 410, cert denied, 357 U.S. 907, 78 S.Ct. 1152, 2 L.Ed.2d 1157 (1958); State v. Higgs, *supra* note 22, 120 A.2d at 154; Murphy v. Lindahl, 24 Ill.App.2d 461, 165 N.E.2d 340, 345, 82 A.L.R.2d 1410 (1960); Corens v. State, 185 Md. 561, 45 A.2d 340, 343–344 (1946).

27. Ham v. South Carolina, 409 U.S. 524, 528, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); Aldridge v. United States, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); United States v. Robinson, 154 U.S.App. D.C. 265, 269, 475 F.2d 376, 380 (1973);

Brown v. United States, 119 U.S.App. D.C. 203, 204, 205, 338 F.2d 543, 544, 545 (1964); Frasier v. United States, 267 F.2d 62, 66 (1st Cir. 1959); Yarborough v. United States, 230 F.2d 56, 63 (4th Cir.), cert. denied, 351 U.S. 969, 76 S. Ct. 1034, 100 L.Ed. 1487 (1956); Stone v. United States, 324 F.2d 804, 807 (5th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Alverez v. United States, 282 F.2d 435, 437–438 (9th Cir. 1960).

28. Aldridge v. United States, *supra* note 27, 283 U.S. at 310, 51 S.Ct. at 471. *Accord*, United States v. Robinson, *supra* note 27, 154 U.S.App.D.C. at 269, 475 F.2d at 380; Sellers v. United States, 106 U.S. App.D.C. 209, 210, 271 F.2d 475, 476 (1959).

29. The judge stated that the first two questions would be accommodated by instructions to the jurors, and that answers to the third would not be disqualifying.

30. United States v. Robinson, *supra* note 27, 154 U.S.App.D.C. at 269, 475 F.2d at 380; Sellers v. United States, *supra* note 28, 106 U.S.App.D.C. at 210–211, 271 F.2d at 476–477; Wilcox v. United States, 58 App.D.C. 244, 245, 29 F.2d 444, 445 (1928), cert. denied, 279 U.S. 834, 49 S.Ct. 253, 73 L.Ed. 983 (1929); Murphy v. United States, 7 F.2d 85, 87 (1st Cir.), cert. denied, 269 U.S. 584, 46 S.Ct. 120, 70 L.Ed. 424 (1925); United States v. Lebron, 222 F.2d 531, 536 (2d Cir.), cert. denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955); Parks v. Ratcliff, 240 A.2d 659, 661 (D.C.App.1968).

men that the indictment was not evidence in the case, but only the means by which Peterson was notified of the charge against him. This was tantamount to an admonition that no basis for an inference of guilt was afforded by the fact that Peterson had been indicted—the subject of Peterson's first question. The judge also paraphrased the charge made against Peterson by the indictment,[31] and from that the veniremen knew that a fatality had been wrought by the discharge of a firearm—the topics upon which Peterson's other two questions focused. And, very importantly, the judge, near the conclusion of the examination, inquired as to whether there was "any reason whatsoever why anyone . . . would prefer not to sit in this case or . . . any reason whatsoever why you do not feel you would be a good . . . fair and impartial juror?" That inquiry called upon each prospective juror, on his oath, to respond if he felt that any aspect of the case, including those of which the judge had informed, might affect his impartiality.

We perceive no prejudice resultant from the denial of Peterson's request. The judge posed a general question that should have elicited instances of bias, if any at all existed, on the part of the veniremen.[32] On the other hand, none of the questions which Peterson proposed—concerning the indictment, the gun or the fatality—related to a matter as to which it has become evident, through experience with juries, that there are strong feelings in the community apt to interfere with a capacity for fair and impartial verdicts, including those on claims of self-defense. Moreover, Peterson made no effort to lay a foundation for his questions by showing either that any such predilections were likely to be encountered, or that his questions were "reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp."[33] In these circumstances, we decline to disturb the judge's ruling.

## III

More than two centuries ago, Blackstone, best known of the expositors of the English common law, taught that "all homicide is malicious, and of course, amounts to murder, unless . . . *justified* by the command or permission of the law; *excused* on the account of accident or self-preservation; or *alleviated* into manslaughter, by being either the involuntary consequence of some act not strictly lawful, or (if voluntary) occasioned by some sudden and sufficiently violent provocation.[34]

Tucked within this greatly capsulized schema of the common law of homicide is the branch of law we are called upon to administer today. No issue of justifiable homicide, within Blackstone's definition is involved.[35] But Peterson's con-

---

31. The judge stated: "it is alleged that Bennie Peterson shot Charles Keitt . . . with a pistol, thereby causing injuries from which [he] did die on the same day," indicating the date the said offense was to have occurred in the District of Columbia.

32. The judge "was not required to put the question[s] in any particular form, or to make any particular number of questions on the subject, simply because requested to do so. . . ." See Ham v. South Carolina, *supra* note 27, 409 U.S. at 527, 93 S.Ct. at 850.

33. United States v. Robinson, *supra* note 27, 154 U.S.App.D.C. at 269–271, 475 F.2d at 380–382.

34. 4 W. Blackstone, Commentaries, 201 (1854 ed.) (original emphasis—footnote omitted). See also 2 F. Pollock & F. Maitland, History of English Law, 478–88 (2d ed. 1923) ; 3 J. Stephens, History of the Criminal Law of England 19 et seq. (1883).

35. By the early common law, justification for homicide extended only to acts done in execution of the law, such as homicides in effecting arrests and preventing forcible felonies, and homicides committed in self-defense were only excusable. See, generally, authorities cited *supra* note 34. The distinction between justifiable and excusable homicide was important because in the latter case the slayer, considered

sistent position is that as a matter of law his conviction of manslaughter—alleviated homicide—was wrong, and that his act' was one of self-preservation—excused homicide. The Government, on the other hand, has contended from the beginning that Keitt's slaying fell outside the bounds of lawful self-defense. The questions remaining for our decision inevitably track back to this basic dispute.

▆▆▆ Self-defense, as a doctrine legally exonerating the taking of human life, is as viable now as it was in Blackstone's[36] time, and in the case before us the doctrine is invoked in its purest form.[37] But "[t]he law of self-defense is a law of necessity;"[38] the right of self-defense arises only when the necessity begins, and equally ends with the necessity;[39] and never must the

necessity be greater than when the force employed defensively is deadly.[40] The "necessity must bear all semblance of reality, and appear to admit of no other alternative, before taking life will be justifiable as excusable."[41] Hinged on the exigencies of self-preservation, the doctrine of homicidal self-defense emerges from the body of the criminal law as a limited though important exception to legal outlawry of the arena of self-help in the settlement of potentially fatal personal conflicts.

▆▆▆ So it is that necessity is the pervasive theme of the well defined conditions which the law imposes on the right to kill or maim in self-defense. There must have been a threat, actual or apparent, of the use of deadly force against the defender.[42] The threat must have been unlawful[43] and immediate.[44]

to be not wholly free from blame, suffered a forfeiture of his goods. F. Wharton, Homicide § 3 at 211 (1855). However, with the passage of 24 Henry VIII, ch. 5 (1532), the basis of justification was enlarged, and the distinction has largely disappeared. More usually the terms .are used interchangeably, each denoting a legally non-punishable act, entitling the accused to an acquittal.

36. The common law continues in force in the District of Columbia save to the extent that it is replaced by or is inconsistent with an act of Congress. D.C.Code § 49–301 (1967). See also United States v. Wharton, 139 U.S.App.D.C. 293, 296, 433 F.2d 451, 454 (1970) ; Hopkins v. United States, 4 App.D.C. 430, 436 (1894).

37. While any unlawful aggression against one's person, habitation or property may justify such reasonable nondeadly force as may be necessary to repel, in this opinion we address specifically, and only, the right of self-defense—defense of the person—as it relates to the use of force of a deadly character.

38. Holmes v. United States, 56 App.D.C. 183, 188, 11 F.2d 569, 574 (1926) ; Hopkins v. United States, *supra* note 36, 4 App.D.C. at 443.

39. Andersen v. United States, 170 U.S. 481, 507–509, 18 S.Ct. 689, 42 L.Ed. 1116 (1898) ; Acers v. United States, 164 U.S. 388, 392, 17 S.Ct. 91, 41 L.Ed. 481 (1896).

40. When we speak of deadly force, we refer to force capable of inflicting death or serious bodily harm.

41. United States v. Wharton, *supra* note 36, 139 U.S.App.D.C. at 300, 433 F.2d at 458 ; Holmes v. United States, *supra* note 38, 56 App.D.C. at 188, 11 F.2d at 574.

42. Brown v. United States, 256 U.S. 335, 342, 344, 41 S.Ct. 501, 65 L.Ed. 961 (1921) ; United States v. Burks, 152 U.S.App.D.C. 284, 287 & n. 5, 470 F.2d 432, 435 & n. 5 (1972) ; United States v. Bush, 135 U.S.App.D.C. 67, 69–70, 416 F.2d 833, 825–826 (1969) ; Harris v. United States, 124 U.S.App.D.C. 308, 309, 364 F.2d 701, 702 (1966) ; Inge v. United States, 123 U.S.App.D.C. 6, 9, 356 F.2d 345, 348 (1966) ; Sacrini v. United States, 38 App.D.C. 371, 377–378 (1912) ; Harris v. United States, 8 App.D.C. 20, 24, 36 L.R.A. 465 (1896).

43. United States v. Hardin, 143 U.S.App.D.C. 320, 324, 443 F.2d 735, 739 (1970) ; Simon v. United States, 137 U.S.App.D.C. 308, 311, 424 F.2d 796, 799 (1970) ; Belton v. United States, 127 U.S.App.D.C. 201, 207, 382 F.2d 150, 156 (1967) ; Preston v. United States, 65 App.D.C. 110, 111, 80 F.2d 702, 703 (1935) ; Holmes v. United States, *supra* note 38, 56 App.D.C. at 188, 11 F.2d at 574 ; Hopkins v. United States, *supra* note 36, 4 App.D.C. at 442.

44. See, Andersen v. United States, *supra* note 39, 170 U.S. at 509, 18 S.Ct. 689 ;

The defender must have believed that he was in imminent peril of death or serious bodily harm,[45] and that his response was necessary to save himself therefrom.[46] These beliefs must not only have been honestly entertained, but also objectively reasonable in light of the surrounding circumstances.[47] It is clear that no less than a concurrence of these elements will suffice.

Here the parties' opposing contentions focus on the roles of two further considerations. One is the provoking of the confrontation by the defender. The other is the defendant's failure to utilize a safe route for retreat from the confrontation. The essential inquiry, in final analysis, is whether and to what extent the rule of necessity may translate these considerations into additional factors in the equation. To these questions, in the context of the specific issues raised, we now proceed.

### IV

The trial judge's charge authorized the jury, as it might be persuaded, to convict Peterson of second-degree murder or manslaughter, or to acquit by reason of self-defense. On the latter phase of the case, the judge instructed that with evidence of self-defense present, the Government bore the burden of proving beyond a reasonable doubt that Peterson did not act in self-de-

fense; and that if the jury had a reasonable doubt as to whether Peterson acted in self-defense, the verdict must be not guilty. The judge further instructed that the circumstances under which Peterson acted, however, must have been such as to produce a reasonable belief that Keitt was then about to kill him or do him serious bodily harm, and that deadly force was necessary to repel him. In determining whether Peterson used excessive force in defending himself, the judge said, the jury could consider all of the circumstances under which he acted.

These features of the charge met Peterson's approval, and we are not summoned to pass on them. There were, however, two other aspects of the charge to which Peterson objected, and which are now the subject of vigorous controversy. The first of Peterson's complaints centers upon an instruction that the right to use deadly force in self-defense is not ordinarily available to one who provokes a conflict or is the aggressor in it. Mere words, the judge explained, do not constitute provocation or aggression; and if Peterson precipitated the altercation but thereafter withdrew from it in good faith and so informed Keitt by words or acts, he was justified in using deadly force to save himself from imminent danger or death or grave bodily harm. And, the judge added, even if Keitt was the aggressor and Peterson was justified in defending him-

Gourko v. United States, 153 U.S. 183, 191, 14 S.Ct. 806, 38 L.Ed. 680 (1894); Gardner v. State, 90 Ga. 310, 17 S.E. 86, 87 (1892); Bailey v. Commonwealth, 15 Ky.Law Rep. 826, 25 S.W. 883, 884, (1894); State v. Shippey, 10 Minn. 223, 88 Am.Dec. 72, 73–74 (1865); Bell v. State, 159 Neb. 474, 67 N.W.2d 762, 767 (1954).

45. Bird v. United States, 187 U.S. 118, 128–131, 23 S.Ct. 42, 47 L.Ed. 100 (1902); Addington v. United States, 165 U.S. 184, 186–187, 17 S.Ct. 288, 41 L. Ed. 679 (1897); Beard v. United States, 158 U.S. 550, 560, 563, 15 S.Ct. 962, 39 L.Ed. 1086 (1895); Gourko v. United States, *supra* note 44, 153 U.S. at 191, 14 S.Ct. 806; United States v. Burks, *supra* note 42, 152 U.S.App.D.C. at 286 n. 5, 470 F.2d at 434 n. 5; Holmes v.

United States, *supra* note 38, 56 App. D.C. at 188, 11 F.2d at 574.

46. See cases cited *supra* note 45.

47. United States v. Hardin, *supra* note 43, 143 U.S.App.D.C. at 324, 443 F.2d at 739; Williams v. United States, 131 U.S.App.D.C. 153, 156–157, 403 F.2d 176, 179–180 (1968); Harris v. United States, *supra* note 42, 124 U.S.App.D.C. at 309, 364 F.2d at 702; Parker v. United States, 81 U.S.App.D.C. 282, 283, 158 F.2d 185, 186 (1946), cert. denied, 330 U.S. 829, 67 S.Ct. 861, 91 L.Ed. 1278 (1947); Preston v. United States, *supra* note 43, 65 App.D.C. at 111, 80 F.2d at 703; Holmes v. United States, *supra* note 38, 56 App.D.C. at 188, 11 F.2d at 574; Grant v. United States, 28 App.D.C. 169, 175 (1906).

self, he was not entitled to use any greater force than he had reasonable ground to believe and actually believed to be necessary for that purpose. Peterson contends that there was no evidence that he either caused or contributed to the conflict, and that the instructions on that topic could only misled the jury.

It has long been accepted that one cannot support a claim of self-defense by a self-generated necessity to kill.[48] The right of homicidal self-defense is granted only to those free from fault in the difficulty; it is denied to slayers who incite the fatal attack, encourage the fatal quarrel or otherwise promote the necessitous occasion for taking life.[49] The fact that the deceased struck the first blow, fired the first shot or made the first menacing gesture does not legalize the self-defense claim if in fact the claimant was the actual provoker.[50] In sum, one who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation. Only in the event that he communicates to his adversary his intent to withdraw and in good faith attempts to do so is he restored to his right of self-defense.[51]

This body of doctrine traces its origin to the fundamental principle that a killing in self-defense is excusable only as a matter of genuine necessity.[52] Quite obviously, a defensive killing is unnecessary if the occasion for it could have been averted, and the roots of that consideration run deep with us. A half-century ago, in Laney v. United States,[53] this court declared

> that, before a person can avail himself of the plea of self-defense against the charge of homicide, he must do everything in his power, consistent with his safety, to avoid the danger and avoid the necessity of taking life. If one has reason to believe that he will be attacked, in a manner which threatens him with bodily injury, he must avoid the attack if it is possible to do so, and the right of self-defense does not arise until he has done everything in his power to prevent its necessity.[54]

And over the many years since *Laney*, the court has kept faith with its precept.[55]

---

48. *E. g.,* Wallace v. United States, 162 U.S. 466, 473–474, 16 S.Ct. 859, 40 L.Ed. 1039 (1896); Parker v. United States, *supra* note 47, 81 U.S.App.D.C. at 283, 158 F.2d at 186. See also cases cited *infra* notes 49–51.

49. Gourko v. United States, *supra* note 44, 153 U.S. at 191–192, 14 S.Ct. 806; United States v. Wharton, *supra* note 36, 139 U.S. App.D.C. at 296, 433 F.2d at 454; Rowe v. United States, 125 U.S.App.D.C. 218, 219, 370 F.2d 240, 241 (1966); Harris v. United States, *supra* note 42, 124 U.S. App.D.C. at 309, 364 F.2d at 702; Frady v. United States, 121 U.S.App.D.C. 78, 98, 99, 348 F.2d 84, 104, 105 (en banc) (concurring opinion), cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965); Parker v. United States, *supra* note 47, 81 U.S.App.D.C. at 283, 158 F. 2d at 186; Hopkins v. United States, *supra* note 36, 4 App.D.C. at 442–443.

50. *E. g.,* Andersen v. United States, *supra* note 39, 170 U.S. at 507–509, 18 S.Ct. 689, 42 L.Ed. 1116; Rowe v. United States, 164 U.S. 546, 554–555, 17 S.Ct. 172, 41 L.Ed. 547 (1896); Stevenson v. United States, 162 U.S. 313, 322, 16 S.Ct. 839,

40 L.Ed. 980 (1896); United States v. Wharton, *supra* note 36, 139 U.S.App.D.C. at 296, 433 F.2d at 454.

51. Rowe v. United States, *supra* note 50, 164 U.S. at 555–557, 17 S.Ct. 172; Harris v. United States, *supra* note 42, 124 U.S.App.D.C. at 309, 364 F.2d at 702; Frady v. United States, *supra* note 49, 121 U.S.App.D.C. at 99, 348 F.2d at 105; Parker v. United States, *supra* note 47, 81 U.S.App.D.C. at 283, 158 F.2d at 186.

52. See Part III, *supra.*

53. 54 App.D.C. 56, 294 F. 412 (1923).

54. *Id.* at 58, 294 F. at 414.

55. See Rowe v. United States, *supra* note 49, 125 U.S.App.D.C. at 219, 370 F.2d at 241. *Cf.* United States v. McCrae, 148 U.S.App.D.C. 116, 459 F.2d 1140 (1972). Cases in other jurisdictions are to the same effect. *E. g.,* Hill v. State, 194 Ala. 11, 69 So. 941, 946–947, 2 A.L.R. 509 (1915); State v. Haffa, 246 Iowa 1275, 71 N.W.2d 35, 43, cert. denied, 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801 (1955); State v. Schroeder, 103 Kan. 770, 176 P. 659, 660 (1918); State v. Cox, 138 Me. 151, 23 A.2d 634, 641–643 (1941);

In the case at bar, the trial judge's charge fully comported with these governing principles. The remaining question, then, is whether there was evidence to make them applicable to the case. A recapitulation of the proofs shows beyond peradventure that there was.

■ It was not until Peterson fetched his pistol and returned to his back yard that his confrontation with Keitt took on a deadly cast. Prior to his trip into the house for the gun, there was, by the Government's evidence, no threat, no display of weapons, no combat. There was an exchange of verbal aspersions[56] and a misdemeanor[57] against Peterson's property[58] was in progress but, at this juncture, nothing more. Even if Peterson's post-arrest version[59] of the initial encounter were accepted—his claim that Keitt went for the lug wrench before he armed himself—the events which followed bore heavily on the question as to who the real aggressor was.[60]

■ The evidence is uncontradicted that when Peterson reappeared in the yard with his pistol,[61] Keitt was about to depart the scene. Richard Hilliard testified that after the first argument, Keitt reentered his car and said "Let's go." This statement was verified by Ricky Gray, who testified that Keitt "got in the car and . . . they were getting ready to go;" he, too, heard Keitt give the direction to start the car. The uncontroverted fact that Keitt was leaving shows plainly that so far as he was concerned the confrontation was ended. It demonstrates just as plainly

---

State v. Summer, 55 S.C. 32, 32 S.E. 771, 772 (1899) ; State v. Hood, 63 W.Va. 182, 59 S.E. 971, 973–974 (1907).

56. See note 11, *supra*, and accompanying text.

57. It is well settled that deadly force cannot be employed to arrest or prevent the escape of a misdemeanant. Wallace v. United States, *supra* note 48, 162 U.S. at 471–474, 16 S.Ct. 859 ; Russell v. State, 219 Ala. 567, 122 So. 683, 685–686 (1929) ; People v. Hecker, 109 Cal. 451, 42 P. 307, 312 (1895) ; Bloom v. State, 155 Ind. 292, 58 N.E. 81, 82–83 (1900) ; Stacey v. Commonwealth, 189 Ky. 402, 225 S.W. 37, 40–41, 25 A.L.R. 490 (1920) ; Brown v. State, 1 Tenn.Cr.App. 294, 441 S.W.2d 485, 487–489 (1969).

58. The law never tolerates the use of deadly force in the protection of one's property. Brown v. United States, *supra* note 42, 256 U.S. at 344, 41 S.Ct. 501, 65 L.Ed. 961 ; Alberty v. United States, 162 U.S. 499, 508, 16 S.Ct. 864, 40 L.Ed. 1051 (1896) ; Wallace v. United States, *supra* note 48, 162 U.S. at 473–474, 16 S.Ct. 859 ; Beard v. United States, *supra* note 45, 158 U.S. at 562, 15 S.Ct. 962, 39 L.Ed. 1086.

59. See Part I, *supra*, following note 18.

60. Notwithstanding that the deceased provoked the original quarrel, the accused cannot, after that quarrel has ended or the deceased has withdrawn, invoke the right of self-defense in a subsequent difficulty which he himself causes or brings on. Rowe v. United States, *supra* note 50, 164 U.S. at 554–557, 17 S.Ct. 172 ; United States v. Hardin, *supra* note 43, 143 U.S.App.D.C. at 324, 443 F.2d at 739 ; Rowe v. United States, *supra* note 49, 124 U.S.App.D.C. at 219, 370 F.2d at 241 ; Preston v. United States, *supra* note 47, 65 App.D.C. at 111, 80 F.2d at 703 ; Laney v. United States, *supra* note 53, 54 App. D.C. at 58–59, 294 F. at 414–415 ; Hopkins v. United States, *supra* note 36, 4 App.D.C. at 442–443.

61. One may deliberately arm himself for purposes of self-defense against a pernicious assault which he has good reason to expect. *E. g.*, Thompson v. United States, 155 U.S. 271, 278, 15 S.Ct. 73, 39 L.Ed. 146 (1894) ; Gourko v. United States, *supra* note 44, 153 U.S. at 191, 14 S.Ct. 806, 38 L.Ed. 680. On the other hand, the true significance of the fact of arming can be determined only in the context of the surrounding circumstances. Compare, Brown v. United States, *supra* note 42, 256 U.S. at 342, 41 S.Ct. 501 ; Allison v. United States, 160 U.S. 203, 215–216, 16 S.Ct. 252, 40 L.Ed. 395 (1895) ; Beard v. United States, *supra* note 45, 158 U.S. at 552, 558, 15 S.Ct. 962 ; Perry v. United States, 137 U.S. App.D.C. 260, 262–263, 442 F.2d 697, 699–700 (1969) ; with Wallace v. United States, *supra* note 48, 162 U.S. at 473–474, 16 S.Ct. 859 ; United States v. Hardin, *supra* note 43, 143 U.S.App.D.C. at 324, 443 F.2d at 739 ; Rowe v. United States, *supra* note 49, 125 U.S.App.D.C. at 219, 370 F.2d at 241 ; Preston v. United States, *supra* note 47, 65 App.D.C. at 111, 80 F.2d at 703.

that even if he had previously been the aggressor, he no longer was.

Not so with Peterson, however, as the undisputed evidence made clear.[62] Emerging from the house with the pistol, he paused in the yard to load it,[63] and to command Keitt not to move. He then walked through the yard to the rear gate and, displaying his pistol, dared Keitt to come in, and threatened to kill him if he did. While there appears to be no fixed rule on the subject, the cases hold, and we agree, that an affirmative unlawful act reasonably calculated to produce an affray foreboding injurious or fatal consequences is an aggression which, unless renounced,[64] nullifies the right of homicidal self-defense.[65] We cannot escape the abiding conviction that the jury could readily find Peterson's challenge to be a transgression of that character.

The situation at bar is not unlike that presented in *Laney*.[66] There the accused, chased along the street by a mob threatening his life, managed to escape through an areaway between two houses. In the back yard of one of the houses, he checked a gun he was carrying and then returned to the areaway. The mob beset him again, and during an exchange of shots one of its members was killed by a bullet from the accused's gun. In affirming a conviction of manslaughter, the court reasoned:

> It is clearly apparent . . . that, when defendant escaped from the mob into the back yard . . . he was in a place of comparative safety, from which, if he desired to go home, he could have gone by the back way, as he subsequently did. The mob had turned its attention to a house on the opposite side of the street. According to Laney's testimony, there was shooting going on in the street. His appearance on the street at that juncture could mean nothing but trouble for him. Hence, when he adjusted his gun and stepped out into the areaway, he had every reason to believe that his presence there would provoke trouble. We think his conduct in adjusting his revolver and going into the areaway was such as to deprive him of any right to invoke the plea of self-defense.[67]

Similarly, in Rowe v. United States,[68] the accused was in the home of friends when an argument, to which the friends became participants, developed in the street in front. He left, went to his nearby apartment for a loaded pistol and returned. There was testimony that he then made an insulting comment, drew the pistol and fired a shot into the ground. In any event, when a group of five men began to move toward him, he began to shoot at them, killing two, and wounding a third. We observed that the accused "left an apparently safe haven to arm himself and return to the scene," [69] and that "he inflamed the situation with his words to the men gathered there, even though he could have

---

62. See Part I, *supra*, at notes 14–16.

63. One of Keitt's companions and Ricky Gray testified that Peterson "broke open" the pistol and inserted one or more bullets immediately upon his exit from the house.

64. See text *supra* at note 51.

65. Compare Andersen v. United States, *supra* note 39, 170 U.S. at 508–509, 18 S.Ct. 689; Wallace v. United States, *supra* note 48, 162 U.S. at 471–474, 16 S.Ct. 859; Rowe v. United States, *supra* note 49, 125 U.S.App.D.C. at 219, 370 F.2d at 241; Laney v. United States, *supra* note 53, 54 App.D.C. at 59, 294 F. at 415; with

Allison v. United States, *supra* note 61, 160 U.S. at 215–216, 16 S.Ct. 252; Beard v. United States, *supra* note 45, 158 U.S. at 558, 15 S.Ct. 962; United States v. Burks, *supra* note 42, 152 U.S.App.D.C. at 286 & n. 4, 470 F.2d at 434–435 & n. 4; United States v. Bush, *supra* note 42, 135 U.S.App.D.C. at 69–70, 416 F.2d at 825–826.

66. Laney v. United States, *supra* note 53.

67. 54 App.D.C. at 58, 294 F. at 414.

68. *Supra* note 49.

69. 125 U.S.App.D.C. at 219, 370 F.2d at 241.

returned silently to the safety of the [friends'] porch." [70] We held that

> [t]hese facts could have led the jury to conclude that [the accused] returned to the scene to stir up further trouble, if not actually to kill anyone, and that his actions instigated the men into rushing him. Self-defense may not be claimed by one who deliberately places himself in a position where he has reason to believe "his presence . . . would provoke trouble." [71]

We noted the argument "that a defendant may claim self-defense if he arms himself in order to proceed upon his normal activities, even if he realizes that danger may await him";[72] we responded by pointing out "that the jury could have found that the course of action defendant here followed was for an unlawful purpose." [73] We accordingly affirmed his conviction of manslaughter over his objection that an acquittal should have been directed.[74]

■ We are brought much the readier to the same conclusion here. We think the evidence plainly presented an issue of fact as to whether Peterson's conduct was an invitation to and provocation of the encounter which ended in the fatal shot. We sustain the trial judge's action in remitting that issue for the jury's determination.

## V

The second aspect of the trial judge's charge as to which Peterson asserts error concerned the undisputed fact that at no time did Peterson endeavor to retreat from Keitt's approach with the lug wrench. The judge instructed the jury that if Peterson had reasonable grounds to believe and did believe that he was in imminent danger of death or serious injury, and that deadly force was necessary to repel the danger, he was required neither to retreat nor to consider whether he could safely retreat. Rather, said the judge, Peterson was entitled to stand his ground and use such force as was reasonably necessary under the circumstances to save his life and his person from pernicious bodily harm. But, the judge continued, if Peterson could have safely retreated but did not do so, that failure was a circumstance which the jury might consider, together with all others, in determining whether he went further in repelling the danger, real or apparent, than he was justified in going.

Peterson contends that this imputation of an obligation to retreat was error, even if he could safely have done so. He points out that at the time of the shooting he was standing in his own yard, and argues he was under no duty to move. We are persuaded to the conclusion that in the circumstances presented here, the trial judge did not err in giving the instruction challenged.

Within the common law of self-defense there developed the rule of "retreat to the wall," [75] which ordinarily forbade the use of deadly force by one to whom an avenue for safe retreat was open.[76] This doctrine was but an application of the requirement of strict necessity to excuse the taking of human life,[77] and was designed to insure the existence of that necessity. Even the innocent victim of a vicious assault had to elect a safe re-

---

70. *Id.*

71. *Id,* quoting Laney v. United States, *supra* note 53, 54 App.D.C. at 58, 294 F. at 414.

72. 125 U.S.App.D.C. at 219, 370 F.2d at 241.

73. *Id.*

74. *Id.*

75. *E. g.,* Laney v. United States, *supra* note 53, 54 App.D.C. at 58, 294 F. at 414.

76. Allen v. United States, 164 U.S. 492, 498, 17 S.Ct. 154, 41 L.Ed. 528 (1896) ; Beard v. United States, *supra* note 45, 158 U.S. at 560–561, 15 S.Ct. 962, 39 L. Ed. 1086, citing Erwin v. State, 29 Ohio St. 186, 23 Am.Rep. 733 (1876). See also cases cited *supra* note 55. See, generally, F. Wharton, Homicide at 213 et seq. (1855).

77. See Part III, *supra.* See also, Commonwealth v. Collazo, 407 Pa. 494, 180 A.2d 903, 906, 907 (1962).

treat, if available, rather than resort to defensive force which might kill or seriously injure.[78]

In a majority of American jurisdictions, contrarily to the common law rule, one may stand his ground and use deadly force whenever it seems reasonably necessary to save himself.[79] While the law of the District of Columbia on this point is not entirely clear, it seems allied with the strong minority adhering to the common law. In 1856, the District of Columbia Criminal Court ruled that a participant in an affray "must endeavor to retreat, . . . that is, he is obliged to retreat, if he can safely."[80] The court added that "[a] man may, to be sure, decline a combat when there is no existing or apparent danger, but the retreat to which the law binds him is that which is the consequence."[81] In a much later era this court, adverting to necessity as the soul of homicidal self-defense,[82] declared that "no necessity for killing an assailant can exist, so long as there is a safe way open to escape the conflict."[83] Moreover, the common law rule of strict necessity pervades the District concept of pernicious self-defense,[84] and we cannot ignore the inherent inconsistency of an absolute no-retreat rule. Until such time as the District law on the subject may become more definitive,[85] we accept these precedents as ample indication that the doctrine of retreat persists.

That is not to say that the retreat rule is without exceptions. Even at common law it was recognized that it was not completely suited to all situations. Today it is the more so that its precept must be adjusted to modern conditions nonexistent during the early development of the common law of self-defense.[86] One restriction on its operation comes to the fore when the circumstances apparently foreclose a withdrawal with safety.[87] The doctrine of retreat

---

78. Beale, Retreat From a Murderous Assault, 16 Harv.L.Rev. 567, 569–70 (1903).

79. See 2 Bishop, Criminal Law § 850.3 at 605 (9th ed. 1865) ; W. Clark & W. Marshall, Crimes § 283 at 383 et seq. (5th ed. 1952) ; R. Perkins, Criminal Law 1005 (2d ed. 1969) ; F. Wharton, Criminal Law and Procedure, §§ 235–40 at 509–20 (Anderson ed. 1957).

80. United States v. Herbert, 26 Fed.Cas. 287, p. 289, No. 15,354a (D.C.Crim.Ct. 1856). There a waiter was slain by a guest during an altercation concerning the service.

81. *Id.* at 290.

82. Laney v. United States, *supra* note 53, 54 App.D.C. at 58, 294 F. at 414. See Part III, *supra.*

83. *Id.*

84. See Part III, *supra*, and Part IV at notes 53–55, 66–74.

85. This court is no longer the final expositor of the local law of the District of Columbia. District of Columbia Court Reform and Criminal Procedure Act of 1970, § 11–102, 84 Stat. 475, D.C.Code § 11–102 (Supp. V 1972). See W. Williams, District of Columbia Court Reorganization, 1970, 59 Geo.L.J. 477, 492–500 (1971). If the retreat doctrine is to be abandoned in the District, it may more appropriately be done by its own courts.

86. "We are aware of the wide diversity of opinion as to the duty to retreat, but this difference arises from the circumstances of the particular case under consideration, rather than from any difference of conception as to the rule itself. Time, place, and conditions may create a situation which would clearly justify a modification of the rule. For example, the common-law rule, which required the assailed to retreat to the wall, had its origin before the general introduction of firearms. If a person is threatened with death or great bodily harm by an assailant, armed with a modern rifle, in open space, away from safety, it would be ridiculous to require him to retreat. Indeed, to retreat would be to invite almost certain death." Laney v. United States, *supra* note 53, 54 App. D.C. at 58–59, 294 F. at 414–415.

87. Allison v. United States, *supra* note 61, 160 U.S. at 215–215, 16 S.Ct. 252 ; Beard v. United States, *supra* note 45, 158 U.S. at 558, 559–564, 15 S.Ct. 962 ; Harris v. United States, *supra* note 42, 124 U.S. App.D.C. at 309, 364 F.2d at 702 ; Holmes v. United States, *supra* note 38, 56 App. D.C. at 188, 11 F.2d at 574 ; Laney v. United States, *supra* note 53, 54 App.D.C. at 58–59, 294 F. at 414–415. See People v. Constantino, 153 N.Y. 24, 47 N.E. 37, 39–40 (1897) ; Commonwealth v. Ware, 137 Pa. 465, 20 A. 806, 808–809 (1890) ; Clark v. Commonwealth, 90 Va.

was never intended to enhance the risk to the innocent; its proper application has never required a faultless victim to increase his assailant's safety at the expense of his own. On the contrary, he could stand his ground and use deadly force otherwise appropriate if the alternative were perilous, or if to him it reasonably appeared to be.[88] A slight variant of the same consideration is the principle that there is no duty to retreat from an assault producing an imminent danger of death or grievous bodily harm.[89] "Detached reflection cannot be demanded in the presence of an uplifted knife,"[90] nor is it "a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or to disable his assailant rather than to kill him."[91]

■■■ The trial judge's charge to the jury incorporated each of these limitations on the retreat rule. Peterson, however, invokes another—the so-called "castle" doctrine.[92] It is well settled that one who through no fault of his own is attacked in his home is under no duty to retreat therefrom.[93] The oft-repeated expression that "a man's home is his castle" reflected the belief in olden days that there were few if any safer sanctuaries than the home.[94] The "castle" exception, moreover, has been extended by some courts to encompass the occupant's presence within the curtilage outside his dwelling.[95] Peterson reminds us that when he shot to halt

360, 18 S.E. 440, 443 (1893). See also text *supra* at notes 79–83.

88. See cases cited *supra* note 87.

89. Brown v. United States, *supra* note 42, 256 U.S. at 342–344, 41 S.Ct. 501, 65 L. Ed. 961; Bird v. United States, *supra* note 45, 187 U.S. at 128–130, 23 S.Ct. 42, 47 L.Ed. 100; Beard v. United States, *supra* note 45, 158 U.S. at 558, 559–560, 564, 15 S.Ct. 962; Starr v. United States, 151 U.S. 614, 621–623, 624, 14 S.Ct. 919, 38 L.Ed. 841 (1894); United States v. Bush, *supra* note 42, 135 U.S.App.D.C. at 69–70, 416 F.2d at 825–826; Laney v. United States, *supra* note 53, 54 App. D.C. at 58, 59, 294 F. at 414, 415; Marshall v. United States, 45 App.D.C. 373, 384 (1916). See text *supra* at notes 79–83.

90. Brown v. United States, *supra* note 42, 256 U.S. at 343, 41 S.Ct. at 502. *Accord,* United States v. Bush, *supra* note 42, 135 U.S.App.D.C. at 69–70, 416 F.2d at 825–826.

91. Brown v. United States, *supra* note 42, 256 U.S. at 343, 41 S.Ct. at 502.

92. See Brown v. United States, *supra* note 42, 256 U.S. at 344, 41 S.Ct. 501; Alberty v. United States, *supra* note 58, 162 U.S. at 507–508, 16 S.Ct. 864, 40 L.Ed. 1051; Beard v. United States, *supra* note 45, 158 U.S. at 560–564, 15 S.Ct. 962; Byrd v. United States, 114 U.S.App.D.C. 117, 118, 312 F.2d 357, 358 (1962). See, generally, 4 W. Blackstone, Commentaries 180–84 (1854 ed.); 1 J. Bishop, Criminal Law §§ 858, 859, at 610–12 (9th ed.

1865); W. Clark & W. Marshall, Crimes, § 289, at 390–92 (5th ed. 1952); R. Perkins, Criminal Law 1022 (2d. ed. 1969); 3 J. Stephens, History of the Criminal Law of England, at 12–15 (1883); F. Wharton, Homicide at 213–13 (1855).

93. Alberty v. United States, *supra* note 58, 162 U.S. at 508, 16 S.Ct. 864; Beard v. United States, *supra* note 45, 158 U.S. at 559–564, 15 S.Ct. 962; Hutcherson v. State, 165 Ala. 16, 50 So. 1027, 1028 (1909); People v. Lewis, 117 Cal. 186, 48 P. 1088, 1090 (1897); De Vaughn v. State, 232 Md. 447, 194 A.2d 109, 112, 113 (1963), cert. denied, 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964); Patten v. People, 18 Mich. 314, 100 Am.Dec. 173, 177–178 (1869); Young v. State, 74 Neb. 346, 104 N.W. 867, 869 (1905); People v. Tomlins, 213 N.Y. 240, 107 N.E. 496, 497 (1914); Commonwealth v. Wilkes, 414 Pa. 246, 199 A.2d 411, 412, cert. denied, 379 U.S. 939, 85 S.Ct. 344, 13 L. Ed.2d 349 (1964).

94. Lee v. State, 92 Ala. 15, 9 So. 407, 408 (1891); People v. Tomlins, *supra* note 93, 107 N.E. at 497. See generally, 3 W. Blackstone, Commentaries 3–4 (1854 ed.); F. Wharton, Criminal Law & Procedure §§ 220–22, at 484–91 (Anderson ed. 1957).

95. *E. g.,* Hicks v. State, 21 Ala.App. 335, 108 So. 612, 613, cert. denied, 214 Ala. 675, 108 So. 614 (1926); State v. Frizzelle, 243 N.C. 49, 89 S.E.2d 725, 726–727 (1955); State v. Brooks, 79 S.C. 144, 60 S.E. 518, 519–520 (1908); Fortune v. Commonwealth, 133 Va. 669, 112 S.E. 861, 867 (1922).

Keitt's advance, he was standing in his yard and so, he argues, he had no duty to endeavor to retreat.

■ Despite the practically universal acceptance of the "castle" doctrine in American jurisdictions wherein the point has been raised,[96] its status in the District of Columbia has never been squarely decided.[97] But whatever the fate of the doctrine in the District law of the future,[98] it is clear that in absolute form it was inapplicable here. The right of self-defense, we have said, cannot be claimed by the aggressor in an affray so long as he retains that unmitigated role.[99] It logically follows that any rule of no-retreat which may protect an innocent victim of the affray would, like other incidents of a forfeited right of self-defense, be unavailable to the party who provokes or stimulates the conflict. Accordingly, the law is well settled that the "castle" doctrine can be invoked only by one who is without fault in bringing the conflict on.[100] That, we think, is the critical consideration here.

■ We need not repeat our previous discussion of Peterson's contribution to the altercation which culminated in Keitt's death.[101] It suffices to point out that by no interpretation of the evidence could it be said that Peterson was blameless in the affair.[102] And while, of course, it was for the jury to assess the degree of fault,[103] the evidence well nigh dictated the conclusion that it was substantial.

The only reference in the trial judge's charge intimating an affirmative duty to retreat [104] was the instruction that a failure to do so, when it could have been done safely, was a factor in the totality of the circumstances which the jury might consider in determining whether the force which he employed was excessive.[105] We cannot believe that any jury was at all likely to view Peterson's

---

96. See text *supra* notes 92–95. *See generally*, Annots. 25 A.L.R. 508 (1923), supplemented in 32 A.L.R. 1541 (1924) and 34 A.L.R. 1488 (1925) ; 52 A.L.R.2d 1458 (1957). See also Annots. 26 A.L.R.3d 1297 (1969) and 41 A.L.R.3d 584 (1972).

97. See Laney v. United States, *supra* note 53, 54 App.D.C. at 59, 294 F. at 415, for a dictum favoring the "castle" rule.

98. See note 85, *supra*.

99. See Part IV, *supra*.

100. Alberty v. United States, *supra* note 58, 162 U.S. at 507–508, 16 S.Ct. 864, 40 L.Ed. 1051; Conley v. State, 38 Ala. App. 618, 92 So.2d 7, 9, cert. strickened, 265 Ala. 450, 92 So.2d 9 (1956) ; Watkins v. State, 89 Ala. 82, 8 So. 134, 136 (1890) ; De Vaughn v. State, *supra* note 93, 194 A. 2d at 112–113; Patton v. People, *supra* note 93, 100 Am.Dec. 177–180; Young v. State, *supra* note 93, 104 N.W. at 868–869. *Accord*, Beard v. United States, *supra* note 45, 158 U.S. at 558, 563–564, 15 S. Ct. 962, 39 L.Ed. 1086; Gant v. United States, 83 A.2d 439, 440 (D.C.Mun.App. 1951) ; Commonwealth v. Emmons, 157 Pa.Super. 495, 43 A.2d 568, 569–570 (1945).

101. See Part I, *supra*, at notes 14–16.

102. See Part I, *supra*, at notes 14–16.

103. *E. g.*, Rowe v. United States, *supra* note 49, 125 U.S.App.D.C. at 219, 370 F. 2d at 241, discussed in Part IV, *supra*, at notes 68–74.

104. The trial judge instructed the jury that Peterson was not required to retreat or to consider whether he could safely retreat if he reasonably and actually believed that deadly force was immediately necessary to avert an imminent peril of death or serious bodily harm. That was but another way of saying that the virtues of retreat may have to yield to the urgency of self-preservation. See text *supra* at notes 89–91. To the extent that this instruction might have been overly charitable to Peterson, he is obviously in no position to complain.

105. As Justice Holmes stated in Brown v. United States, *supra* note 42, 256 U.S. at 343, 41 S.Ct. at 502, "[r]ationally the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing . . . ."

conduct as irreproachable. We conclude that for one who, like Peterson, was hardly entitled to fall back on the "castle" doctrine of no retreat, that instruction cannot be just cause for complaint.

## VI

As we have stated, Peterson moved for a judgment of acquittal at trial, and in this court renews his contention that the evidence was insufficient to support a conviction of manslaughter.[106] His position is that the evidence, as a matter of law, established a right to use deadly force in self-defense. In considering that contention, we must accept the evidence "in the light most favorable to the Government, making full allowance for the right of the jury to draw justifiable inferences of fact from the evidence adduced at trial and to assess the credibility of the witnesses before it." [107] We have already concluded that the evidence generated factual issues as to the effect, upon Peterson's self-defense claim, of his aggressive conduct and his failure to ·retreat.[108] By the same token, the ultimate question of guilt or innocence of culpable homicide was one for the jury to decide. The jury resolved the question in favor of guilt, and we perceive no basis for disturbing its decision. Nor, in the circumstances here, is there a ground for impugning its verdict that the grade of Peterson's offense was manslaughter.[109]

The judgment of conviction appealed from is accordingly

Affirmed.

106. See text *supra* at note 19.

107. United States v. Hardin, *supra* note 43, 143 U.S.App.D.C. at 322, 443 F.2d at 737. *Accord,* Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ; Crawford v. United States, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967) ; Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

108. See Parts IV and V, *supra*.

109. *E. g.,* Rowe v. United States, *supra* note 50, 164 U.S. at 556, 17 S.Ct. 172, 41 L.Ed. 547 ; Gourko v. United States, *supra* note 44, 153 U.S. at 191, 14 S.Ct. 806, 38 L.Ed. 680 ; Harris v. United States, *supra* note 42, 124 U.S.App.D.C. at 309, 364 F.2d at 702 ; Rowe v. United States, *supra* note 49, 125 U.S.App.D.C. at 219, 370 F.2d at 241 ; Parker v. United States, *supra* note 47, 81 U.S.App.D.C. at 283, 158 F.2d at 186.